**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 8, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AWA NIANG,

        Petitioner,

v.

ALBERTO R. GONZALES,
United States Attorney General,

        Respondent.

No. 04-9547

---

**PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS
(B.I.A. NO. A78-897-221)**

---

Michael A. Walker of Walker Associates, LLP, Denver, Colorado, for Petitioner.

Luis E. Perez, Trial Attorney (Linda S. Wendland, Assistant Director, with him on the brief), Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

---

Before **TACHA,** Chief Circuit Judge, **McWILLIAMS** , Senior Circuit Judge, and **HARTZ** , Circuit Judge.

---

**HARTZ** , Circuit Judge.

Petitioner Awa Niang is a victim of female genital mutilation (FGM). She

faces removal from this country because she overstayed her nonimmigrant visa,

was working in the United States without permission of the Immigration and Naturalization Service (INS),[1] and had falsely represented herself as a citizen to obtain employment. To avoid being returned to her native Senegal, she sought asylum and restriction on removal on the ground that she had suffered past persecution—FGM—in Senegal. She also sought relief under the Convention Against Torture (CAT),[2] on the ground that she was likely to be tortured if returned to Senegal.

The immigration judge (IJ) who conducted her hearing found that she had not been subjected to past persecution because he disbelieved her account of how the FGM occurred. The Board of Immigration Appeals (BIA) affirmed on the same ground. Ms. Niang's claims for asylum and restriction on removal, however, do not rest solely on her narrative of the specific circumstances of the mutilation. She has consistently, although with less-than-optimal clarity,

---

[1]On March 1, 2003 the INS ceased to exist, and its responsibilities were divided among three distinct agencies formed within the new Department of Homeland Security. See Homeland Security Act of 2002, Pub.L. No. 107-296, §§ 441, 451, 116 Stat. 2135 (November 25, 2002). But because the actions Ms. Niang challenges in this appeal were taken prior to this reorganization, we will refer to the relevant government agency as the INS.

[2]The Convention Against Torture is formally referred to as The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85. The United States implemented the Convention Against Torture through the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105- 277, § 2242, 112 Stat. 2681 (1998). *See Elzour v. Ashcroft*, 378 F.3d 1143, 1150 n.8 (10th Cir. 2004).

contended that she suffered FGM on account of her being a female member of the Tukulor Fulani tribe. Neither the IJ nor the BIA addressed this contention, much less explained why it was rejected. We therefore reverse the denial of asylum and restriction on removal, and we remand for further proceedings. We affirm the denial of relief under the CAT.

## I.    BACKGROUND

### A.    Ms. Niang's Account

The following summarizes the documents and testimony supporting Ms. Niang's claims for relief. She was born into the Tukulor Fulani tribe in Senegal in 1970. Her family is Muslim and believes in rigid adherence to certain gender roles and expectations. There was a strict separation between the men and women in her household, which included her parents, eight siblings, some cousins, and their spouses. Her family believed that women should not look at men, that family members should not display affection toward one another, and that women should obey their husbands.

According to tribal custom, when Ms. Niang was born she was promised in marriage to her cousin Daud, a man her father's age who had three other wives. Because she was considered married to Daud, she was not allowed to date other men. Although most Tukulor Fulani girls were subjected to FGM and consummated their marriages when they were 10 to 12 years old, Ms. Niang

refused to do so and her family acquiesced in her wishes, believing she would eventually change her mind. Unlike most Tukulor Fulani women, Ms. Niang was permitted to attend school at age 12.

When Ms. Niang was nearly 25, her family had a meeting in which they decided that she must consummate her marriage with Daud that evening. She again refused, and her family threw themselves on her, stripping her of her clothes, beating her, and burning her with a hot iron. Some then performed FGM on her "[s]o that [she] wouldn't be able to commit adultery and so that no one would want to have anything to do with [her]. And then she would be ashamed to show [her] body in front of another man." Testimony of Ms. Niang, R. at 188. She left her house the next morning. For the next four years she stayed at her friend Maria's house in another town while attending the university to obtain her Senegalese law license. She had no contact with her family during this time.

Ms. Niang came to the United States in 1999 and stayed with friends in Denver. Although she "wanted to live in a country where [she] could feel free," and she still feared her family, *id.* at 194, she did not immediately seek asylum but entered as a nonimmigrant visitor, authorized to stay only until June 24, 2000. She met Elhadji Fall and married him on April 17, 2000. Because of her FGM, however, they could not have normal sexual relations and they separated. During her marriage Ms. Niang's Senegalese friend Maria wrote her a letter informing her

-4-

that her family considered her an adulteress because of her marriage to Fall and would kill her if she returned. According to Ms. Niang, if she was returned to Senegal, her family was "ready" and "waiting for [her]," and it would be "the end of [her] days." R. At 204-05.

B.     Removal Proceedings

The INS apprehended Ms. Niang while she was working as a security screener at the Denver International Airport. It initiated removal proceedings against her for (1) staying in the country longer than permitted, Immigration and Nationality Act (INA) § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B); (2) failing to comply with the conditions of her nonimmigrant status by working, INA § 237(a)(1)(C), 8 U.S.C. § 1227(a)(1)(C); and (3) falsely representing herself as a citizen of the United States to gain employment, INA § 237(a)(3)(D), 8 U.S.C. § 1227(a)(3)(D). She contested the factual basis of the removal charges, but the IJ found her removable on all three grounds. She then requested either (1) asylum under INA § 208, 8 U.S.C. § 1158; (2) restriction on removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3); (3) relief from removal under the CAT, or (4) voluntary departure under INA § 240B, 8 U.S.C. § 229c.

At the asylum hearing Dr. Judith Wilson testified that Ms. Niang had been a victim of FGM, that her "normal anatomy . . . had been obliterated essentially to the extent that her ability to engage in normal sexual intercourse was virtually

-5-

impossible," that she would probably not be able to conceive children naturally, and that she would not be able to deliver children vaginally. R. at 239-240. Judging from the scar tissue, Dr. Wilson estimated that the mutilation must have occurred at least three or four years before Ms. Niang's 1999 examination, and it could have been performed as early as her late teens. In a letter from Dr. Wilson to Ms. Niang's attorney that was admitted into the record, Dr. Wilson wrote that Ms. Niang told her that the beating and genital mutilation occurred in her late teens.

Ms. Niang also showed several burn scars to the IJ, and Dr. Wilson testified that the scars were consistent with her proffered account of her beating by her family. Finally, Dr. Wilson testified that the FGM did not look like a "medical[ly] oriented procedure" and agreed with the description that "the lady was butchered." *Id*. at 247.

The IJ found that "[t]he evidence considered as a whole clearly shows that the respondent has suffered FGM in the past," *id.* at 60, that according to the background material the FGM was most likely "excision," *id.* at 59; and that "in Senegal 80 percent of the women will undergo that form of FGM," *id*. (The IJ apparently confused the statistics for FGM victims in Senegal and Sierre Leone. According to the 1997 United States Department of State Report entitled "Female Genital Mutilation" (which appears in the record), Sierre Leone had an 80-90%

-6-

victimization rate at that time, while Senegal's was only 20%.) Ms. Niang's membership in the Tukulor Fulani tribe is not disputed. But the IJ did not find Ms. Niang credible for several reasons: (1) she lied to gain employment; (2) on her asylum application she listed her parents' address as her address from 1978 to 1999, but she testified that she had fled her parents' home in 1995 after the alleged attack occurred; (3) she could name only two of the five pillars of Islam, despite her characterization of her family as Islamic extremists; (4) he did not understand why she did not undergo the mutilation before age 13, as her sisters had; and (5) Dr. Wilson's letter was inconsistent with Ms. Niang's testimony that the attack occurred when she was 25. Because the IJ found Ms. Niang's account of how the genital mutilation occurred not credible, he denied her petitions for asylum, restriction on removal, and relief under the CAT.

Ms. Niang appealed to the BIA. The BIA affirmed the IJ's decision and dismissed the appeal through an order written by a single board member. *See* 8 C.F.R. § 1003.1(e)(5)(2003) (under new streamlining procedures one member of board can address decision on the merits unless criteria require review by three-member panel). The BIA summarized the IJ's reasons for finding Ms. Niang's testimony not credible, and concluded that she had not demonstrated that the adverse credibility ruling was clearly erroneous. *See* 8 C.F.R. § 1003.1(d)(3)(i)

(IJ's credibility findings reviewed under clearly-erroneous standard). In reference to the undisputed genital mutilation, the BIA stated:

> We also acknowledge that the respondent has undergone FGM, has other scarring, and that the practice of FGM can provide the basis for an asylum claim. Yet, we have not held that all instances of FGM will constitute past persecution and we decline to find that this respondent's FGM constituted persecution due to her incredible testimony regarding the circumstances surrounding the FGM.

R. at 2 (internal citations omitted). Ms. Niang appeals this decision, contending that (1) the BIA erred in affirming the IJ's adverse credibility finding and (2) her undisputed genital mutilation constitutes past persecution on account of membership in a social group regardless of how it occurred. We exercise jurisdiction under 8 U.S.C. § 1252(a), *see Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1234 (10th Cir. 2003). We affirm under the CAT but reverse and remand for further proceedings with respect to the denials of asylum and restriction on removal.

## II. DISCUSSION

### A. Overview of Applicable Law

There are three avenues of relief for an alien who fears persecution if returned to a particular country. Under the INA a grant of asylum permits the alien to remain in this country and a restriction on removal forbids removal to the country where persecution may occur. *Wiransane v. Ashcroft*, 366 F.3d 889, 892-93 (10th Cir. 2004). Although a grant of asylum is in the discretion of the

Attorney General, a restriction on removal is granted to qualified aliens as a matter of right. *Id.* at 893. The third avenue is the CAT, which prohibits removal to a country where the alien would face torture. *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). Relief under the CAT is mandatory if the convention's criteria are satisfied. *See* 8 C.F.R. § 1208.16(c)(4) (an alien meeting CAT's criteria "shall be granted" withholding of removal or, at a minimum, deferral of removal).

### 1. Asylum

To be eligible for a discretionary grant of asylum, an alien must be a refugee. 8 U.S.C. § 1158(b)(1); *see Elzour v. Ashcroft*, 378 F.3d at 1148. The INA defines *refugee* as

> any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). This definition is taken from the 1967 United Nations Protocol Relating to the Status of Refugees (the Refugee Protocol), ratified by the United States in 1968.[3] A primary purpose for which Congress adopted this

---

[3]The Refugee Protocol defines *refugee* as one who:

owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is

(continued...)

definition in 1980 was " to bring United States refugee law into conformance with the [Refugee Protocol]." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

The governing regulation provides two ways of achieving refugee status: one based on past persecution and the other based on a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(2001). Our focus in this case is on past persecution. The regulation states:

> An applicant *shall* be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality [on one of the forbidden grounds]. . . , and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution.

*Id.* § 1208.13(b)(1) (emphasis added). *See* 63 Fed. Reg. 31,945; 31,946 (June 11, 1998) (explaining that amended regulation effective January 5, 2001, "leaves intact the important principle that an applicant who has established past persecution on account of one of the five grounds is a refugee"). The persecution must have been "imposed by the government or by groups which the government is

---

[3](...continued)
unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

The Refugee Protocol, Jan. 31, 1967, 19 U.S.T. 6223 (Nov. 1, 1968, date in force).

unwilling or unable to control". *Vatulev v. Ashcroft*, 354 F.3d 1207, 1209 (10th Cir. 2003) (internal quotation marks omitted). Thus, "to establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Berishaj v. Ashcroft*, 378 F.3d 314, 323 (3rd Cir. 2004) (internal quotation marks omitted). *Accord Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000).

Refugee status does not, however, entitle the applicant to a grant of asylum; that decision continues to remain within the Attorney General's discretion. *See Cardoza-Fonseca*, 480 U.S. at 428 n.5; 63 Fed. Reg. at 31,946. The regulation describes how the IJ should exercise discretion with respect to an applicant who is asylum eligible on the basis of past persecution. First, the past persecution establishes a presumption of a well-founded fear of future persecution on the same basis as established for the original persecution. 8 C.F.R. § 1208.13(b)(1). The INS may rebut this presumption, however, by proving that "there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality. . . on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 C.F.R § 1208.13(b)(1)(i)(A), or proving that "[t]he applicant could

avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so, " *id.* § 1208.13(b)(1)(i)(B). If the INS successfully rebuts the presumption, the IJ "in the exercise of his or her discretion, . . . shall deny the asylum application," *id.* § 1208.13(b)(1)(i), unless "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or "[t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." *id*. at § 1208.13(b)(1)(iii). *See* 63 Fed. Reg. at 31,946. This avenue of obtaining a favorable discretionary grant of asylum in the absence of a well-founded fear of future persecution is known as humanitarian asylum. *See Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004).

## 2.    Restriction on Removal

To obtain a restriction on removal, an applicant must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The Attorney General may not remove an alien who establishes "a clear probability of persecution in the country to which he would be returned." *Wiransane*, 366 F.3d at 894 (internal quotation marks omitted). Just as an applicant can be granted refugee status on the basis of past persecution, an

applicant can establish a presumptive entitlement to restriction on removal on the same basis. And just as a refugee can be denied asylum because of a change in circumstances or the opportunity to relocate, an applicant for restriction on removal can lose the presumption of entitlement for that reason. The regulation states:

> (1) *Past threat to life or freedom.* (i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:
>
> (A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or
>
> (B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 1208.16 (b)(1).

### 3. Convention Against Torture

The CAT prohibits the return of an alien to a country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 1208.16(c)(2). "A claim under the CAT differs from a claim for asylum or withholding of removal under the INA because there is no requirement that the petitioner[] show that

-13-

torture will occur on account of a statutorily protected ground." *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005) (internal quotation marks omitted). The alien must show, however, that the persecution would be so severe that it would rise to the level of torture. *Elzour*, 378 F.3d at 1150. Torture is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1) (1999). Under the CAT future torture is not presumed on the basis of a showing of past torture. But "[i]n assessing whether it is more likely than not that an applicant would be tortured . . . , all evidence relevant to the possibility of future torture shall be considered, including . . . [e]vidence of past torture inflicted upon the applicant." 8 C.F.R. § 1208.16(c)(3).

## B.    Standard of Review

We review the BIA's legal determinations de novo, and its findings of fact under a substantial-evidence standard. *Elzour v. Ashcroft*, 378 F.3d at 1150. Under the substantial-evidence standard "our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence

-14-

considering the record as a whole." *Id.* "The BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (internal quotation marks omitted).

Moreover, the BIA's interpretations of ambiguous provisions in the INA are entitled to particular respect under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Supreme Court has instructed that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted). *See Tapia Garcia v. INS*, 237 F.3d 1216, 1220 (10th Cir. 2001). Indeed, "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." *Aguirre-Aguirre*, 526 U.S. at 425 (internal quotation marks omitted). Thus, if the INA "is silent or ambiguous with respect to the specific issue before it, . . . the question for the court [is] whether the [BIA's] answer is based on a permissible construction of the statute." *Id.* at 424 (internal quotation marks omitted).

Finally, we must be cautious not to assume the role of the BIA. Decisions should be made in the first instance by the BIA. And when it has failed to address

a ground raised by an applicant in support of her claim, we should ordinarily not reverse on that ground but should instead remand if the ground appears to have any substance. *See INS v. Orlando Ventura,* 53 U.S. 12 (2002).

## C.    Application to FGM

As acknowledged by the BIA in its decision in this case, FGM can be the basis of a claim of past persecution. An alien making such a claim must establish that (1) the FGM constituted persecution; (2) the alien belonged to a particular social group; and (3) there was a nexus between the FGM and membership in the group—that is, the FGM was performed on account of her membership in that group. We proceed to examine each of the components of such a claim.

### 1.    Persecution

The INA does not define *persecution.* We have held that persecution "requires the infliction of suffering or harm . . . in a way regarded as offensive," *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (10th Cir. 2001) (internal quotation marks omitted), and "encompasses more than just restrictions or threats to life and liberty," *Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992) (internal quotation marks and brackets omitted). The BIA has explicitly recognized that FGM constituted persecution. *In re Fauziya Kasinga*, 21 I. & N. Dec. 357, 358 (1996). That opinion provides the following description of such mutilation:

> [T]he FGM practiced by her tribe . . . is an extreme type involving cutting the genitalia with knives, extensive bleeding, and a 40-day recovery period.
>
> . . .
>
> FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. It can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions.

*Id.* at 361.

Although many cases construing *persecution* involve persecutors who had the subjective intent to punish their victims, "this subjective punitive or malignant intent is not required for harm to constitute persecution." *Id.* at 365 (internal quotation marks omitted). Thus, whether Ms. Niang suffered the mutilation when she was 25 in an attack by her family, or at about the age of 10 as is customary for other members of her tribe, appears to be irrelevant in deciding whether her mutilation constituted persecution.

Other circuits agree that FGM constitutes persecution, whether for the purpose of determining past persecution or the purpose of determining well-founded fear of persecution. *See Mohammed v. Gonzales*, 400 F.3d 785, 795 (9th Cir. 2005) (past persecution) ("[W]e have no doubt that the range of procedures collectively known as female genital mutilation rises to the level of persecution within the meaning of our asylum law."); *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th

-17-

Cir. 2004) (future persecution) ("Forced female genital mutilation involves the infliction of grave harm constituting persecution . . . that can form the basis of a successful claim for asylum."); *Nwaokolo v. INS*, 314 F.3d 303, 308 (7th Cir. 2002) (per curiam) (future persecution) ("FGM is a horrifically brutal procedure").

### 2. Social Group

Although Ms. Niang has added various factual embellishments, her central claim has been that she was subjected to FGM because she was a female within a tribe practicing this ritual. Even if her embellishments are disbelieved, she may be entitled to relief if females in the Tukulor Fulani tribe constitute a social group within the meaning of the INA and she suffered FGM because she is a female in that group.

This circuit has not yet addressed the meaning of "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). But the BIA did so in *In re Acosta,* 19 I. & N. Dec. 211, 233-234 (1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (1987). *Acosta* began its analysis by noting the ambiguity of the statutory term:

> Congress did not indicate what it understood [membership in a particular social group] to mean, nor is its meaning clear in the [Refugee] Protocol. This ground was not included in the definition of a refugee proposed by the committee that drafted the U.N. Convention; rather it was added as an afterthought. International jurisprudence interpreting this ground of persecution is sparse. It has been suggested that the notion of a 'social group' was considered to be of broader application than the combined notions of racial, ethnic, and

-18-

religious groups and that in order to stop a possible gap in the coverage of the U.N. Convention, this ground was added to the definition of a refugee. A purely linguistic analysis of this ground of persecution suggests that it may encompass persecution seeking to punish either people in a certain relation, or having a certain degree of similarity, to one another or people of like class or kindred interests, such as shared ethnic, cultural, or linguistic origins, education, family background, or perhaps economic activity. The [United Nations High Commissioner for Refugees] has suggested that a 'particular social group' connotes persons of similar background, habits, or social status and that a claim to fear persecution on this ground may frequently overlap with persecution on other grounds such as race, religion, or nationality.

*Id.* at 232-33 (internal citations omitted).

Applying the canon of construction *ejusdem generis*, *see Black's Law Dictionary* 535 (7th ed. 1999) (defining *ejusdem generis* as "[a] canon of construction that when a general word or phrase follows a list of specific . . . things, the general word or phrase will be interpreted to include only . . . things of the same type as those listed."), the BIA construed *membership in a particular social group* in a manner consistent with the more specific grounds listed. Because *race*, *religion*, *nationality*, and *political opinion* "describe[] persecution aimed at an immutable characteristic: a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed," the BIA reasoned that the characteristics defining a particular social group must also be so limited. 19 I. & N. Dec. at 233. It concluded:

-19-

> [W]e interpret the phrase 'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. . . . [W]hatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

*Id.* at 233.

As we have previously stated, we must defer to the BIA's permissible interpretation of ambiguous language in the INA. *See INS v. Aguirre-Aguirre*, 526 U.S. at 424-25. We agree that the term *social group* is ambiguous and find the BIA's above analysis to be reasonable. The BIA's construction of "membership in a particular social group" is therefore a permissible construction of the statute to which we must defer. *See id.* Five other circuits have done the same. *See Alvarez-Flores v. INS*, 909 F.2d 1, 7 (1st. Cir 1990)*; Elien v. Ashcroft*, 364 F.3d 392, 396-97 (1st Cir. 2004)*; Fatin v. INS*, 12 F.3d 1233, 1240 (3rd. Cir. 1993)*; Castellano-Chacon v. INS*, 341 F.3d 533, 546-48 (6th Cir. 2003); *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998); *Thomas v. Gonzales*, 409 F.3d 1177, 1184-87 (9th Cir. 2005) (en banc).

We recognize that two circuits may take a different view. But the leading case in one does not even cite *Acosta*, much less explain why the court should not defer to the BIA's definition of *social group*. *See Gomez v. INS*, 947 F.2d 660,

-20-

664 (2d Cir. 1991) ("A particular social group is comprised of individuals who possess some fundamental characteristic in common which serves to distinguish them in the eyes of a persecutor—or in the eyes of the outside world in general."). And the Eighth Circuit, although quoting with apparent approval a formulation not found in *Acosta*, proceeds to apply the reasoning of the Third Circuit's opinion in *Fatin,* 12 F.3d at 1240*,* which follows *Acosta,* to deny relief. *See Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994). Neither of these opinions persuades us to reject or modify the *Acosta* definition.

Applying the *Acosta* definition of *social group*, the female members of a tribe would be a social group. Both gender and tribal membership are immutable characteristics. Indeed, *Acosta* itself identified sex and kinship ties as characteristics that can define a social group. *See Acosta*, 19 I. & N. Dec. at 233.

There may be understandable concern in using gender as a group-defining characteristic. One may be reluctant to permit, for example, half a nation's residents to obtain asylum on the ground that women are persecuted there. *See Safaie*, 25 F.3d at 640 (rejecting claim that "Iranian women, by virtue of their innate characteristic (their sex) and the harsh restrictions placed upon them, are a particular social group"). *Cf. Gomez v. INS*, 947 F.2d 660, 663-64 (2d Cir. 1991) (rejecting claim that "women who have been previously battered and raped by Salvadoran guerillas" are a particular social group). But the focus with respect to

such claims should be not on whether either gender constitutes a social group (which both certainly do) but on whether the members of that group are sufficiently likely to be persecuted that one could say that they are persecuted "on account of" their membership. 8 U.S.C. § 1101(a)42(A). It may well be that only certain women—say, those who protest inequities—suffer harm severe enough to be considered persecution. The issue then becomes whether the protesting women constitute a social group.

We are not persuaded that the BIA, contrary to the language of *Acosta*, requires more than gender plus tribal membership to identify a social group. The one decision that may suggest this requirement is *Kasinga,* in which the BIA granted asylum to a woman who feared being subjected to FGM if returned to her native land. The BIA described her social group as "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice." 21 I. & N. Dec. at 365. The Board noted that its description was "very similar to the formulations suggested by the parties." *Id. See id.* at 372 (Filppu, Bd. Mem., concurring) ("the social group definition has not been a real source of dispute between the parties"). It explained its ruling as follows:

> The defined social group meets the test we set forth in *Matter of Acosta* [, 21 I. & N. Dec.] at 233. See also *Matter of H-*, Interim Decision 3276 (BIA 1996) (finding that identifiable shared ties of kinship warrant characterization as a social group). It also is

-22-

consistent with the law of the United States Court of Appeals for the Third Circuit, where this case arose. *Fatin v. INS*, 12 F.3d 1233, 1241 (3d Cir.1993) (stating that Iranian women who refuse to conform to the Iranian Government's gender-specific laws and social norms may well satisfy the *Acosta* definition).

> In accordance with *Acosta*, the particular social group is defined by common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities. The characteristics of being a "young woman" and a "member of the Tchamba-Kunsuntu Tribe" cannot be changed. The characteristic of having intact genitalia is one that is so fundamental to the individual identity of a young woman that she should not be required to change it.

*Id.* at 365-66. We find it noteworthy that *Kasinga*'s explanation provides no reason why more than gender or tribal membership would be required to identify a social group. Indeed, the opinion states that it is "[i]n accordance with *Acosta*," *id.* at 366, and *Acosta* specifically identifies "sex [and] kinship ties" as shared characteristics that can define a social group. *Acosta*, 19 I. & N. Dec. at 233. This is not to say that an asylum applicant cannot include opposition to FGM as an identifying characteristic of the social group to which she belongs. She may choose to do so to assist in establishing the nexus component of her claim to refugee status. *See Fatin v. INS*, 12 F.3d 1233, 1240-41 (3d Cir. 1993) (Iranian woman could not establish a well-founded fear of persecution based solely on her gender, but she might be able to show fear based on gender plus opposition to Iranian gender-specific laws). The point is only that opposition is not a necessary

-23-

component of a social group otherwise defined by gender and tribal membership. We now turn to the nexus requirement.

### 3.     Nexus

For persecution to be "on account of" membership in a social group, the victim's protected characteristic must be central to the persecutor's decision to act against the victim. *See Gebremichael v. INS*, 10 F.3d 28, 35 (1st Cir. 1994) ("An applicant qualifies as a 'refugee' under the INA if membership in a social group is 'at the root of persecution,' such that membership itself generates a 'specific threat to the applicant'."). This requirement is relatively straightforward. It is important to note, however, that opposition to FGM need not be proved to establish nexus. We agree with the Ninth Circuit's discussion of this point in *Mohammed v. Gonzales*, 400 F.3d 785, 797 (9th Cir. 2005). The court held that the petitioner, a female member of a tribe that subjected its females to FGM, had established past persecution on account of being a member of a social group defined by her gender and tribal membership. It explained:

> We believe that opposition is not required in order to meet the "on account of" prong in female genital mutilation cases. The persecution at issue in these cases—the forcible, painful cutting of a female's body parts—is not a result of a woman's opposition to the practice but rather a result of her sex and her clan membership and/or nationality. That is, the shared characteristic that motivates the persecution is not opposition, but the fact that the victims are female in a culture that mutilates the genitalia of its females.

*Mohammed v. Gonzales*, 400 F.3d at 797 n.16. This is not to say that an adult's voluntary submission to FGM necessarily constitutes persecution.

### D. Ms. Niang's Claims

#### 1. Asylum and Restriction on Removal

As previously explained, if Ms. Niang can establish that she has suffered persecution on account of her membership in a social group, she may be a refugee eligible for asylum and she may be presumptively entitled to a restriction on removal. The IJ, affirmed by the BIA, rejected her claim of past persecution, however, because he found incredible her account of how she suffered FGM. We will not set aside such a credibility determination if the "IJ . . . give[s] specific, cogent reasons for an adverse credibility finding" that are not "based on speculation or conjecture." *Wiransane*, 366 F.3d 889, 897-898 (10th Cir. 2004). The IJ and BIA sufficiently supported the credibility determination here.

But Ms. Niang's claim of past persecution does not depend entirely on her account of the attack by her family. She has made the broader claim that she suffered FGM on account of her being a female member of the Tukulor Fulani tribe. It is undisputed that she suffered FGM, and the injuries described by Dr. Wilson—her scarring, inability to engage in normal sexual relations, and inability to bear children naturally—would certainly be sufficiently serious to qualify her FGM as persecution. It is also undisputed that she is a female Tukulor

-25-

Fulani, and the IJ did not appear to question that the custom of the tribe is to perform FGM on its female members. The State Department Report on Female Genital Mutilation reports that about 20% of Senegalese women have undergone the mutilation and lists the "Toucouleur" tribe as one of the specific ethnic groups that practice the ritual. R. at 326. The IJ apparently believed Ms. Niang's statements that all her sisters had undergone the genital mutilation at a younger age, because he used that information to discredit her testimony that her family performed the FGM when she was 25.

Yet neither the IJ nor the BIA addressed this broader claim. We therefore must remand for further proceedings to resolve it. If the BIA determines that she did suffer persecution in the form of FGM as the result of her tribal membership, it would next need to address whether the persecution was "committed by the government or forces the government is either unable or unwilling to control." *Berishaj*, 378 F.3d at 323. If the BIA finds this third element of refugee status, Ms. Niang is a refugee, and she is also entitled to a presumption for asylum purposes that she has a well-founded fear of future harm on account of her social group and a presumption for restriction-on-removal purposes that she will be persecuted in her home country on account of her social group. The BIA would therefore need to determine on remand whether the presumptions have been overcome.

### 2. Convention Against Torture

In contrast to the presumptions applicable in asylum and restriction-on-removal proceedings, under the CAT a petitioner is not entitled to a presumption of future torture based on evidence of past torture; nor does a showing of past torture automatically render her CAT eligible. Although past torture is a relevant consideration for the IJ in assessing the likelihood of future torture, 8 C.F.R. §1208.16(c)(3)(i), it is only one factor in the assessment. Here, our review of Ms. Niang's CAT claim is controlled by the permissible finding that she is untruthful. *See Wiransane*, 366 F.3d 897-98. Once one discredits Ms. Niang's description of her family's attack on her and the threats of future harm from her family, one could rationally decide that she had failed to show that if she returned to Senegal she would be killed or otherwise subjected to torture. We therefore affirm the BIA's rejection of this claim.

## III. CONCLUSION

We AFFIRM the denial of relief under the CAT, REVERSE the decision of the BIA with respect to asylum and restriction on removal, and REMAND this case for further proceedings consistent with this opinion.