**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

HOVHANNES ORUJYAN,

Petitioner,

v.

ALBERTO R. GONZALES,[*]

Respondent.

No. 04-9594
(No. A95-219-160)
(Petition for Review)

**ORDER AND JUDGMENT**[**]

Before **TYMKOVICH**, **PORFILIO**, and **BALDOCK**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*]     On February 4, 2005, Alberto R. Gonzales became the United States Attorney General. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Mr. Gonzales is substituted for John Ashcroft as the Respondent in this action.

[**]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Hovhannes Orujyan is a citizen of Armenia who faces removal from this country. He seeks review of the decision of the Board of Immigration Appeals (BIA) affirming the decision of an Immigration Judge (IJ) denying his application for asylum, restriction on removal,[1] and relief under the Convention Against Torture. We deny the petition for review.

**FACTS**

Petitioner entered the United States illegally in January, 2001, near San Ysidro, California. He filed his application for asylum on November 26, 2001, and was issued a notice to appear in removal proceedings a few months later. He has conceded his removability from this country. On July 25, 2003, he received a hearing before the IJ, at which he testified concerning his application for asylum and other claims of relief from removal.

At his hearing, petitioner testified that he belonged to the Russian military from 1986 to 1988. He completed a trade school program in carpentry in 1990, and afterwards became a Fedayi, which he described as an Armenian volunteer

---

[1]     Prior to the amendments to the Immigration and Nationality Act made by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), "restriction on removal" was known as "withholding of removal." *Wiransane v. Ashcroft* , 366 F.3d 889, 892 n.1 (10th Cir. 2004). Although the BIA referred in its decision to "withholding of removal," since this claim was filed after IIRIRA's effective date, we will use the term "restriction on removal" here.

freedom fighter, until 1992. In 1992, he became a member of the Armenian military, and in 1994 he was assigned the title of lieutenant in the Armenian army.

Petitioner was assigned to a post on the Iranian border. He encountered problems there beginning in 1997. He testified that lower-ranking soldiers in the Armenian army without political connections were abused and brutally beaten by their officers. These soldiers were ordered to go to their homes and obtain money to be paid to the officers, and were pressured into petty theft.

Petitioner heard during this time period that an officer named Alen Poghosyan had murdered an unnamed soldier. Poghosyan had been extorting this soldier for money and also apparently was hazing him because the soldier was believed to be a homosexual.

Captain Gorusk Grigoryan, in petitioner's unit, also hazed army conscripts. At some point, petitioner was approached by a solider named Razmik Amiryan, who requested petitioner's help in obtaining a transfer to a different part of the country. Rumors had been spreading in his unit that Amiryan was a homosexual, and as a result, he had been mocked and abused by other soldiers, who had beaten him and threatened to kill him. Grigoryan was one of the soldiers who had threatened Amiryan with death.

Petitioner approached Captain Grigoryan to arrange a transfer for Amiryan. Grigoryan, however, responded poorly to the overture, telling petitioner that "this

disgusting person had to stay here and serve in the army here and die here."
Admin. R. at 101. Grigoryan told petitioner not to interfere, or the same would
happen to petitioner.

Amiryan died on May 26, 2000. Petitioner described the events of that day
in detail. He was assigned to go to the border with Amiryan, to undertake their
regular shift. He heard a pistol shot. Petitioner headed toward the sound, telling
other soldiers to stay behind until he could determine if there would be more
shooting.

Petitioner found Amiryan on the ground. Nearby, Grigoryan and another
soldier were laughing. Petitioner, angered by the laughter, asked them to help
Amiryan. They responded that Amiryan had shot himself. When petitioner
examined the body, he found that Amiryan had been shot in the head from behind
and that the exit wound had "exploded" his face. *Id.* at 104. Petitioner
unbuttoned Amiryan's shirt and found that his entire body was covered in bruises.
Grigoryan then took out his pistol and put it to petitioner's head, threatening to
kill petitioner if he told anyone about the circumstances of Amiryan's death.

The soldiers took Amiryan to a first aid office and he was transferred to a
hospital, where he died. Petitioner later filed a complaint with the military. As a
result of his complaint, an officer from the defense ministry visited the base.
Petitioner testified that he was unable to meet with this officer, however, because

it was petitioner's day off when the officer visited the base. This was inconsistent with the statement attached to his asylum application, in which petitioner specifically stated that he had spoken with the officer.

After the officer visited the base, Captain Grigoryan called petitioner on the telephone, to tell him that "what you wanted has happened." *Id.* at 107.[2] Grigoryan, who had been advised that petitioner had filed a complaint against him, again threatened petitioner with death. Petitioner stated that he had also been warned about Grigoryan by an official at the defense ministry where he had filed his complaint.

The day after the officer from the defense ministry came to the base in Goris, Captain Grigoryan ordered petitioner to appear at the base. He yelled at petitioner and threatened to kill him and his family. He held petitioner by the throat and pushed him, saying "I'll get rid of you." *Id.* at 109.

Petitioner never returned to the base after this incident. He subsequently prepared a letter to a human rights organization called the "Helsinki office[]," *id.*, detailing everything he had witnessed at the army base and the events of the Amiryan case. He did not keep a copy of the letter. He claimed that the letter

---

[2]     At first, petitioner identified the person who called him at home as the officer who had visited his army base; he later clarified, however, that it was Captain Grigoryan who was speaking.     *See* Admin. R. at 107-08.

was intercepted by either the military or the police before it ever reached the Helsinki office.

About a week after petitioner wrote the letter, two men came to his home. One was dressed in a police uniform, and the other in plainclothes. They knocked on the door to petitioner's house, and when he began to open it, they slammed the door into petitioner's face, knocking him down. The two men began kicking him while he lay on the ground. When his wife came to help him, they kicked her also, and the police officer also beat his son and pushed him away. The men arrested petitioner, calling him a spy for sending a letter to the Helsinki office. They showed him the letter that he had sent. They tied petitioner's hands and took him in a military jeep to prison.

Petitioner testified that he remained in jail from June 28, 2000 until July 7th of that year. He was beaten while in prison. He stated he was hit with a glass bottle and that a gun was put to his head, and the trigger pulled, but the gun was empty. He was given a court date of September 5, 2000.

Petitioner's brother paid a bribe of $1,500 to obtain his release from prison. He obtained the money by selling petitioner's home. Upon his release, petitioner took his family to live with his nephew. He then went to the hospital, where it was determined that his nose was broken, and he received stitches on his head. A hospital report that petitioner submitted, however, mentions only multiple bruises

and makes no mention of a broken nose or stitches. Petitioner later left Armenia and made his way to this country via several other countries including Turkey, Russia, Spain, and several South and Central American countries.

Petitioner's passport was held by the Armenian court pending his scheduled appearance there on September 5, 2000. His brother helped him obtain a replacement passport. This passport bore an issue date of May 17, 2000. When asked about the issue date, petitioner at first testified that his brother helped him to get the passport "in advance because I knew that I was going to need a passport." *Id.* at 131. When reminded, however, that the issue date was *before* Razmik Amiryan's murder and the seizure of his passport by the Armenian court, petitioner claimed that the date of issue on the passport was incorrect, and that it had been backdated to permit him to cross the border. *Id.* at 132.

Petitioner stated that after he left Armenia, his brother told him that petitioner's wife had been beaten. She was in hiding at petitioner's cousin's house but petitioner stated "she used to go back and forth to the old house to get clothing and necessary items and she was followed and they caught her and they beat her up" inside the house. *Id.* at 138. At the time of the IJ hearing, she was in Germany. Petitioner's children remained in Armenia where they were shuttled between relatives for their protection.

The IJ found that petitioner's testimony was "not sufficiently detailed, consistent or believable to provide a plausible and coherent account of the basis for his fears" of persecution if he were returned to Armenia. *Id.* at 74. Given the lack of credibility of petitioner's account, and the questionable weight of the medical evidence he had supplied to corroborate his claims, the IJ found that petitioner had failed to establish his eligibility for asylum. The BIA, noting alleged inconsistencies in petitioner's testimony, determined that the IJ's decision was not clearly erroneous and therefore dismissed petitioner's appeal.

## ANALYSIS

### 1. Standard of review

The parties disagree concerning the scope of our review. While petitioner refers repeatedly to the IJ's credibility findings, the government contends that the BIA's order is the proper target for review. The BIA did not expressly adopt the IJ's findings. *See id.* at 2. Instead, in a per curiam decision, the BIA provided its own brief analysis of the case, noting that it did not find the IJ's decision clearly erroneous and citing the facts underlying several of the IJ's specific adverse credibility findings. Since the BIA's decision is the agency's final decision, and is adequate in itself to provide a meaningful basis for our review, we review the BIA's decision rather than the IJ's. *See Cruz-Funez v. Gonzales*,

406 F.3d 1187, 1190-91 (10th Cir. 2005); *Krastev v. INS*, 292 F.3d 1268, 1275 (10th Cir. 2002).[3]

"We review the BIA's legal determinations de novo, and its findings of fact under a substantial-evidence standard." *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005). The agency's findings of fact are conclusive unless the record demonstrates that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## 2. Asylum claim

To be eligible for asylum, an alien must first show that he is a "refugee." *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004). To establish refugee status, the applicant must demonstrate that he has suffered past persecution or has "a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution."

---

[3]     We assume that although the per curiam order *dismissed* petitioner's appeal, it was entered pursuant to 8 C.F.R. § 1003.1(e)(5), which permits a single BIA member to issue "a brief order affirming, modifying, or remanding the decision under review."

*Wiransane*, 366 F.3d at 893 (quotation omitted). We will not reverse the agency's decision unless the evidence compels the conclusion that petitioner has a well-founded fear of persecution based on one of the protected grounds. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

The BIA found the IJ's ultimate conclusion, that petitioner's story was not credible, not to be clearly erroneous. Having reviewed the administrative record, we agree. The BIA further stated that petitioner's testimony was not credible because he had failed to adequately explain in his agency appeal certain discrepancies noted by the IJ. The BIA noted two specific discrepancies:

> 1. In the statement filed with his application for asylum, petitioner stated that the officer who came to his unit after he complained to the ministry of defense had spoken with petitioner privately. In his testimony before the IJ, however, petitioner contended that he did not speak with the officer because it was petitioner's day off.

> 2. In petitioner's testimony before the IJ, he stated that he was released from jail after his brother paid a bribe with funds from the sale of petitioner's home. Petitioner later stated, however, that after he was in the United States, he learned that his wife was beaten after she went back and forth to their home to get necessary items. If the home had been sold, it is unclear why the family's personal items were still located there.

The BIA also noted the questionable value of the medical document petitioner submitted to corroborate his claim of abuse while he was in custody. Although petitioner asserted that he was diagnosed and treated at the hospital for a broken nose and a head wound requiring stitches, the medical record he

presented in substantiation of this claim noted only "multiple bruises on the several parts of his body." Admin. R. at 161.

Petitioner's attempts to explain these inconsistencies are unpersuasive, and do not satisfy the very high standard required to overturn the agency's findings of fact. *See* Aplt. Br. at 12-13; 15. While he points out some factual errors the IJ may have made in arriving at his adverse credibility finding, he fails to overcome the BIA's ultimate conclusion that the IJ's adverse credibility finding was not clearly erroneous. Nor do we agree with petitioner that the inconsistencies noted by the IJ and the BIA are minor inconsistencies that do not relate to the basis of his fear of persecution. In sum, we cannot agree with petitioner, given the lapses in credibility and corroboration relied upon by the agency, that the evidence in his case compelled a finding that he is a refugee entitled to consideration for asylum.

### 3. Restriction on removal

To qualify for restriction on removal, an alien must show a "clear probability" of persecution in the proposed country of removal. *Niang*, 422 F.3d at 1195. The same lack of credibility and corroboration that doom petitioner's asylum claim also foreclose relief under the more stringent standard attached to restriction on removal. *See generally Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1234 (10th Cir. 2003).

### 4. Convention Against Torture

In its order, the BIA found that petitioner "has not specifically addressed the denial of protection pursuant to the Convention Against Torture, aside from a brief reference in the conclusion to [his] appeal brief." Admin. R. at 3. Since petitioner did not raise any specific issues involving the Convention Against

Torture before the BIA, there is nothing for us to review. *See Tulengkey v. Gonzales*, 425 F.3d 1277, 1279 n.1 (10th Cir. 2005).

The petition for review is DENIED.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge