FILED
United States Court of Appeals
Tenth Circuit

July 28, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

ARMENUHI HAYRAPETYAN,

Petitioner,

v.

MICHAEL B. MUKASEY, United States Attorney General,[*]

Respondent.

No. 06-9538

---

**On Petition for Review of an Order of the
Board of Immigration Appeals**

---

Asbet A. Issakhanian of Glendale, California, for Petitioner.

Joanne E. Johnson, United States Department of Justice, Office of Immigration Litigation, Washington, D.C. (Peter D. Keisler, Assistant Attorney General, Civil Division; Mary Jane Candaux, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division; and N. Christopher Hardee and Ihan Kim, United States Department of Justice, Washington, D.C., on the brief), for Respondent.

---

Before **TYMKOVICH**, **McKAY**, and **SEYMOUR**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

[*] Mr. Michael Mukasey has been substituted for Alberto Gonzales per Fed. R. App. 43(c)(2).

Armenuhi Hayrapetyan petitions for review of a Board of Immigration Appeals (BIA) decision denying her application for asylum and restriction on removal under the Immigration and Nationality Act (INA) and the United Nations Convention Against Torture (CAT). A native and citizen of Armenia, Ms. Hayrapetyan entered the United States illegally in September 2003. In February 2004, she filed her application for asylum and restriction on removal, claiming she would be persecuted if forced to return to Armenia because of her past efforts as a television reporter to expose corruption in the ruling regime of President Robert Kocharian. The immigration judge (IJ) denied the application, concluding the mistreatment she suffered did not rise to the level of political persecution. The BIA summarily affirmed the IJ's decision. We reverse and remand.

**I.**

Ms. Hayrapetyan began working as a reporter for a private television station in Hrazdan, Armenia in 1999. She initially worked on a children's program, but later moved to reporting on political issues. At a hearing before the IJ, Ms. Hayrapetyan testified that because her political reports threatened to expose government corruption and the oppression of the Armenian people, the television station where she worked was warned not to air her reports, and she and her husband were repeatedly harassed, threatened, detained, and abused by the police and other government officials acting on behalf of the regime of

-2-

President Kocharian.

The first such incident occurred in November 2001, when she was assigned to interview newly-inducted soldiers at the army base in Armavir, Armenia. She interviewed the soldiers in private, and they told her about torture and other mistreatment they were suffering as new recruits. She had permission from the military to conduct the interviews, which her crew filmed, but when she returned to work she was told the Ministry of Defense had called the director of the television station and told him not to air the interviews. Her boss told her that if he aired the program he would lose his license and she would lose her job.

The next incident occurred on October 25, 2002, as Ms. Hayrapetyan and her film crew were leaving a demonstration organized in remembrance of eight parliament members who were gunned down in 1999. Ms. Hayrapetyan testified that she and her crew were stopped by the police after she finished filming the demonstration. When she showed her identification, the police became very angry, slapped her, and confiscated her documents and camera equipment. She claims the police told her, "[y]ou prepared this material to bring us to justice." Admin R. at 107. It is unclear what happened after this run-in with the police, but as far as we can tell from Ms. Hayrapetyan's testimony, she went to the police station on November 4, 2002, to retrieve her confiscated documents. While there, Arum Manukyan, whom Ms. Hayrapetyan described as "the national defense department's lead interrogator," *id.*, tried to force her to sign a statement saying

-3-

that she had accepted a bribe from opposition leaders.  When she refused to sign,

she was jailed for two days.  When her husband tried to visit her, he was beaten

by the police and refused visitation.  When she was released, the police warned

her to think carefully about her family before preparing any more reports.  She

took the threats seriously because other outspoken journalists in Armenia at the

time were being attacked and murdered. *Id.* at 110.[**]  Ms. Hayrapetyan testified

that she filed a complaint about this incident with the prosecutor's office, but that

nothing came of it.

The next incident occurred on March 5, 2003, the day of Armenia's widely-

criticized presidential run-off election.[***]  Ms. Hayrapetyan testified that as she

was preparing a report on ballot-box stuffing, the Yerkrapahs (Kocharian loyalists

who were allegedly doing the stuffing) approached her assistants and told them to

stop filming.  When she tried to intervene, she was knocked to the ground and

kicked by the Yerkrapahs.  She sought the protection of the police, but they

arrested her and took her to the police station.  There, the chief of police told her

"you already know who Kocharian is, we are not asking for your justice.  He is

---

[**]Ms. Hayrapetyan presented considerable material to the IJ documenting the beating and murder of journalists in Armenia. *See, e.g.*, Admin. R. at 218-21 (exhibit list describing articles about, *inter alia*, attacks on journalists in Armenia in connection with the reporting of political opposition to the president).

[***]The non-governmental organization Human Rights Watch reported that Armenia's 2003 presidential election "was marred by serious irregularities, including widespread ballot box stuffing."  Admin R. at 241 (quotation omitted).

the president." *Id.* at 113. He confiscated her tape, and slapped her. When she told him she would complain to international observers, he held her in a cell until the next morning. When she returned home, she learned that her husband, who had also been observing the election, had been hospitalized after being beaten by the Yerkrapahs in retaliation for his wife's "long tongue." *Id.* He was hospitalized for fifteen days.

After Ms. Hayrapetyan discovered her husband was in the hospital, she arranged a meeting with the co-chairman of the Helsinki Human Rights Association in Armenia on April 2. On March 27, however, Ms. Hayrapetyan was walking home when a car drove into her on the sidewalk, seemingly on purpose. She was injured as she attempted to move out of the way, hospitalized, and released the next morning. When she returned home, she discovered that someone had apparently attempted to kidnap her daughter from kindergarten. Individuals had approached her daughter and called out to her, but she was able to get away. Because Ms. Hayrapetyan had received telephone threats against her family prior to the kidnapping attempt, the incident distressed her and she did not allow her daughter to return to school. She also cancelled her planned meeting with human rights officials.

On April 30, 2003, Ms. Hayrapetyan was fired from her job at the television station. She was told by the director of the station that he was firing her because the Ministry of Defense threatened to revoke the station's license due

to the nature of her reporting. Shortly thereafter, she and her family left Hrazdan and moved to another city in Armenia to stay with her husband's family. Even there, however, she continued to receive telephone threats. After a short while, she decided it was not safe to stay in Armenia. Thus, in May 2003, she and her family went to Russia. While there, Ms. Hayrapetyan testified, they suffered harsh discrimination on account of being Armenian. On September 2, 2003, Ms. Hayrapetyan traveled to Mexico on a tourist visa, and from there she surreptitiously crossed the border into the United States. Her husband and daughter remained in Russia.

## II.

The IJ generally found Ms. Hayrapetyan to be a credible witness. He nevertheless concluded that she failed to establish she was a refugee within the meaning of the INA. He dismissed her claims of past persecution and characterized what happened to her as mistreatment by disgruntled individuals rather than retaliatory acts of the Kocharian regime:

> The respondent described the incidents which occurred . . . in the past. She was accosted on two occasions while doing her journalistic work. She was detained for what the Court believes are brief periods of time by the authorities. She was slapped. She had a nose bleed at one time. *However, I don't find that these incidents are serious enough to rise to the level of persecution. They seem to be hostile actions by people feeling they are being adversely affected by the news media.* I don't believe they rise to the level of persecution and I don't think that the respondent has shown that she suffered

-6-

persecution in the past.

*Id.* at 81 (emphasis added).  The IJ also determined that Ms. Hayrapetyan failed to show a well-founded fear of future persecution, reasoning that it was unlikely she would continue her career in journalism and that there was no evidence of a pattern or practice of persecution against ex-journalists in Armenia.  Finally, he denied her requests for restriction on removal under the INA and CAT, concluding that she failed to show it was more likely than not that she would be persecuted or tortured upon her return to Armenia.

Because the BIA summarily affirmed the IJ's decision, we treat that decision as if it were the BIA's.  *Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1235 (10th Cir. 2003), *superceded on other ground by statute*, 8 U.S.C. § 1252(a)(2)(D).  We review the BIA's findings of fact under the substantial evidence standard, and its legal determinations *de novo.  Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005).  "In this circuit, the ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution."  *Vicente-Elias v. Mukasey*, Case Nos. 07-9542, 07-9545, 2008 WL 2699399, at *4(10th Cir. July 11, 2008), *citing Nazarghaie v. INS*, 102 F.3d 460, 463 n.2 (10th Cir. 1996).  The BIA's determination must be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *INS v. Elias-Zacarias*,

-7-

502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)).  Thus, we may reverse the BIA's decision "only if the evidence presented by [the alien] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed."  *Id.*  We are also "cautious not to assume the role of the BIA," which is charged with making decisions on asylum applications in the first instance.  *Niang*, 422 F.3d at 1197.  Consequently, when the BIA fails to address an argument raised by an applicant, the proper course is to "remand if the ground appears to have any substance."  *Id.*

### III.

Illegal aliens seeking to avoid deportation out of fear of persecution in their homeland have three avenues of recourse: (1) seeking asylum, (2) applying for restriction on removal under the INA, and/or (3) applying for restriction on removal under the CAT.  Each of the three avenues has its own standards that must be met before a court can grant such relief.

First, in order to be eligible for asylum, an alien must demonstrate by a preponderance of the evidence that she is a refugee, meaning that she is outside the country of her nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); *see also Elzour v. Ashcroft*, 378 F.3d 1143,

1148-49 (10th Cir. 2004). She can establish refugee status in three ways: (1) by showing a well-founded fear of future persecution; (2) by showing past persecution sufficient to give rise to a presumption that she has a well-founded fear of future persecution; or (3) by showing past persecution so severe that it supports an unwillingness to return to the country where the persecution occurred. *Chaib v. Ashcroft*, 397 F.3d 1273, 1277 (10th Cir. 2005). To prove a well-founded fear of persecution, "it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (quotation marks and citation omitted). "In cases in which an applicant has demonstrated past persecution," 8 C.F.R. § 1208.13(b)(1)(ii), she "shall also be presumed to have a well-founded fear of persecution on the basis of the original claim," §1208.13(b)(1), unless the government can prove by a preponderance of the evidence, § 1208.13(b)(1)(ii), that either "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," § 1208.13(b)(1)(i)(A), or that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality," § 1208.13(b)(1)(i)(B).

Second, an alien may apply for restriction on removal in order to avoid being returned to the country of persecution. Restriction on removal under the INA prohibits the removal of an alien to a country "if the Attorney General

decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Under the statute, the alien must establish "a clear probability of persecution," *Elzour*, 378 F.3d at 1149. Like an asylum claim, once an alien has shown past persecution, there is a "presumptive entitlement to restriction on removal on the same basis." *Niang*, 422 F.3d at 1195.

Third, restriction on removal is also available under the CAT if the alien can prove "it is more likely than not that he or she would be tortured" if removed to a particular country. *Id.* at 1196 (quotation and citation omitted). An alien petitioning under the CAT need not show that the torture would be on account of a statutorily protected ground, only that "the persecution would be so severe that it would rise to the level of torture." *Id.*

Ms. Hayrapetyan's asylum application was based on past persecution and a well-founded fear of future persecution. She claimed she was persecuted by the police and other Kocharian henchmen on account of her political reporting. Additionally, she testified that she does not believe she would be safe anywhere in Armenia if she is forced to return.

The IJ rejected Ms. Hayrapetyan's claim of past persecution because he found that the mistreatment she suffered amounted to no more than "hostile

actions by people . . . adversely affected by the news media," Admin. R. at 81, apparently concluding that this conduct did not amount to persecution on account of political opinion. But this analysis ignores the fact that it was the Armenian government, or groups within its control, that engaged in the hostile actions. It also fails to recognize that those actions were taken in retaliation for Ms. Hayrapetyan's threatened exposure of government corruption. This alone can support a claim of political persecution. *See Zhang v. Gonzales*, 426 F.3d 540, 542 (2d Cir. 2005) ("retaliation for opposition to government corruption may . . . constitute persecution on account of political opinion."); *Hasan v. Ashcroft*, 380 F.3d 1114, 1120-21 (9th Cir. 2004) (exposure of political leader's corruption is "inherently political"); *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000) (whistleblowing against abuse of public trust is necessarily political, even where whistleblower does not espouse political theory).

The Ninth Circuit's discussion in *Hasan* is particularly instructive. The petitioner there, a Bangladeshi journalist, claimed she was retaliated against for writing an article criticizing an important government leader. The article accused the leader of, among other things, "terrorism, repression, and extortion, of misappropriation of public money . . . and of making his political office an office of corruption." *Hasan*, 380 F.3d at 1120 (quotations omitted). Overruling the BIA, the Ninth Circuit held that the article's content was "indisputably political" in nature, *id.*, and that the retaliation against its author was necessarily because of

-11-

her political opinion. *Id.* at 1121.

> When the alleged corruption is inextricably intertwined with governmental operation, the exposure and prosecution of such an abuse of public trust is necessarily political . . . .
>
> . . . .
>
> "[T]he salient question" in determining whether an act of whistleblowing is political is whether it was "directed toward a governing institution, or only against individuals whose corruption was aberrational."

*Id.* at 1120 (quoting *Grava*, 205 F.3d at 1181).

"[R]etaliation completely untethered to a governmental system does not afford a basis for asylum." *Grava*, 205 F.3d at 1181, n.3. We agree with our sister circuits, however, that official retaliation against one who threatens to expose governmental corruption may, in certain circumstances, amount to political persecution. Thus, if the retaliation against Ms. Hayrapetyan was carried out by mere civilians motivated by personal vengeance, there would be no basis for asylum. That was not the case here. Ms. Hayrapetyan described retaliation by the police for her attempts to document institutionalized government corruption, particularly the rampant ballot-box stuffing that occurred during Armenia's 2003 presidential election. Moreover, it is clear that Ms. Hayrapetyan's reporting focused not on "individuals whose corruption was aberrational," *Hasan*, 380 F.3d at 1120 (quotation omitted), but on what she has described as a "criminal government" run by "corrupted authorities." Admin. R. at 381. Based on the record before us, we conclude that the IJ applied the wrong legal standard in

-12-

assessing whether Ms. Hayrapetyan was politically persecuted.

The IJ also found that the incidents raised by Ms. Hayrapetyan were not "serious enough to rise to the level of persecution." Admin. R. at 81. Upon reviewing the record, however, we conclude that the IJ understated what occurred to Ms. Hayrapetyan and to her family in Armenia.

In *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004), we attempted to clarify the meaning of persecution:

> Although persecution is not defined in the INA, we have held that a finding of persecution requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty. Such persecution may be inflicted by the government itself, or by a non-governmental group that the government is unwilling or unable to control.

Id. (internal quotations and citations omitted). Here, there is evidence that Ms. Hayrapetyan and her family suffered from such persecution. Ms. Hayrapetyan was not briefly detained, as described by the IJ. *Id.* She was jailed for two days in November 2002 and imprisoned overnight in March 2003. Moreover, contrary to the statement of the IJ, Ms. Hayrapetyan was not merely slapped, she was knocked to the ground and kicked by the Yerkrapahs on one occasion, and nearly run over by a vehicle on another. Likewise, her husband was beaten in November 2002 when he tried to visit her in jail, and again in March 2003, when he was beaten so severely that he had to be hospitalized for fifteen days. Around the

-13-

same time, Ms. Hayrapetyan's daughter was almost abducted. Ms. Hayrapetyan also received telephone threats at home throughout this time period, as well as after she relocated. Finally, she was fired from her job after the Minister of Defense threatened the station manager. Viewing all of the incidents in sum, we are persuaded there was sufficient evidence from which a reasonable factfinder could conclude that the Armenian government's treatment of Ms. Hayrapetyan amounted to "more than just restrictions or threats to life and liberty" and thus constituted political persecution. *Id.*

These incidents distinguish the facts of this case from those in *Kapcia v. INS*, 944 F.2d 702 (10th Cir. 1991), where this court upheld a determination that the petitioner did not establish he had suffered from past persecution. In *Kapcia*, unlike here, the petitioner did not receive any threats at home (although his home was searched), nor were any of his family members beaten or almost abducted. *Id.* at 704-05. More importantly, the petitioner was persecuted for being a member of the Polish Solidarity movement, a group that had become part of the coalition government by the time of the asylum hearing. *Id.* at 704, 707. Unlike the drastic changes in Poland's political climate, there is no evidence of political change in Armenia. Thus, we conclude *Kapcia* is sufficiently distinguishable from this case and does not preclude our conclusion that there is sufficient evidence here to find that Ms. Hayrapetyan was indeed persecuted in Armenia.

Because the IJ applied the wrong legal standard in determining Ms. Hayrapteyan failed to prove past political persecution, and because this record would support a determination to the contrary under the correct standard, we reverse the IJ's determination and remand for the IJ to reconsider, in light of this opinion, whether Ms. Hayrapetyan suffered from past political persecution. We also remand on Ms. Hayrapetyan's claim for restriction on removal. We are not convinced, however, that Ms. Hayrapetyan has provided sufficient evidence from which a factfinder could conclude it is more likely than not that she would be tortured if she returned to Armenia. Accordingly, we affirm the IJ's denial of her claim under the Convention Against Torture.[****]

We **AFFIRM** the denial of Ms. Hayrapetyan's CAT claim, but we **REVERSE** her claims for asylum and restriction on removal and **REMAND** for reconsideration consistent with this opinion.

---

[****]If the IJ should find under the appropriate standard that Ms. Hayrapetyan has established past political persecution, she would be entitled to a rebuttable presumption under both the INA and the statute governing the restriction on removal that she has a well-founded fear of future persecution. 8 C.F.R. §§ 1208.13(b)(1), 1208.16(b)(1).