FILED
United States Court of Appeals
Tenth Circuit

October 10, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

POLTAK PARLINDUNGAN
SAGALA,

Petitioner,

v.

MICHAEL B. MUKASEY, United
States Attorney General,

Respondent.

No. 08-9506
(Petition for Review)

**ORDER AND JUDGMENT**\*

Before **O'BRIEN**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**McCONNELL**, Circuit Judge.

Poltak Parlindungan Sagala, a native and citizen of Indonesia, petitions for

review from a final order of removal issued by the Board of Immigration Appeals

(BIA).  The BIA found no merit in his contention that an immigration judge

---

\*       After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

(IJ) erred in denying his applications for asylum, restriction on removal under 8 U.S.C. § 1231(b)(3), and relief under the Untied Nations Convention Against Torture (CAT). We dismiss the petition in part and, exercising jurisdiction under 8 U.S.C. § 1252(a)(1), deny the petition in part.

## Background

Mr. Sagala entered the United States on or about July 5, 2000, as a nonimmigrant exchange visitor. He was authorized to remain until January 4, 2001, but never left. In February 2003, he married an Indonesian woman, who also was in the United States without authorization. He submitted an application for asylum, restriction on removal, and CAT relief in March 2003, claiming that, if he returned to Indonesia, a predominantly Muslim country, he would be persecuted on account of his Christian religion and Batak ethnicity, a minority group in Indonesia. The application was referred to an IJ, and Mr. Sagala also received a notice to appear that charged him as removable under 8 U.S.C. § 1227(a)(1)(B) for overstaying his visa. In 2005, Mr. Sagala and his wife had a son, who is a United States citizen.

Before the IJ, Mr. Sagala conceded removability but renewed his request for asylum, restriction on removal, and CAT relief. He also requested voluntary departure to an unspecified country. He testified that in public elementary school, he was repeatedly taunted by Muslim students and once fought with a Muslim student who had called him names. He reported this incident to a teacher who did

nothing because the teacher also was Muslim. He eventually graduated from college in 1997, but claimed that because of his faith, he was not allowed to run for school office at any school level or compete for the school honor guard at the national level. He also stated that he sustained a disfiguring burn to his arm and scratches to his leg when the military used some type of chemical to dispel a demonstration in 1998. Mr. Sagala further testified that he was unable to obtain a job with the Indonesian government because he refused to convert to Islam. He was able to obtain work with a private company for a short while, but the company shut down in 1998. In July 2000, he left Indonesia and came to the United States. He said that he did not immediately apply for asylum because he thought Indonesian officials would learn about the application and possibly harm family members in Indonesia.

Mr. Sagala presented two other witnesses at the hearing. His uncle, a United States citizen and a Christian, testified that on a return trip to Bali in 2005, he dined at a restaurant where, just hours later, a bomb killed twenty-three people and wounded others. The uncle said he still travels annually to Indonesia but is afraid to identify himself as a U.S. citizen or a Christian because of the level of hatred toward those groups. Mr. Sagala's other witness was the pastor of his Christian church in Colorado. The pastor testified that in 1998, he removed a bomb that was placed in his church in Indonesia during a service and it exploded outside. In 2000, he received a package bomb, which he did not open because he

knew that ten other churches had received package bombs. The pastor stated that Christians could go to places in Indonesia that were predominantly Christian, such as Papua, to practice their religion, but they still feared radical Muslims.

In an oral decision, the IJ denied asylum because Mr. Sagala had failed to file an application within one year of his arrival in the United States, as required by 8 U.S.C. § 1158(a)(2)(B), and no extraordinary or exceptional circumstances justified his late filing. As for restriction on removal, the IJ found that although Mr. Sagala had experienced discrimination in Indonesia, primarily on account of his religion, it did not rise to the level of persecution. The IJ found that Mr. Sagala had not established a likelihood of future persecution if he returned to Indonesia because he had not sustained his burden of showing that relocation to a predominantly Christian area of that country was unreasonable. The IJ also found that Mr. Sagala had not shown that it was more likely than not that he would be tortured if he returned to Indonesia. The IJ therefore ordered him removed to Indonesia if he did not voluntarily depart the United States within an allotted time.

The BIA affirmed in a brief order, "find[ing] no clear error in the [IJ]'s factual findings regarding the nature of the respondent's past experiences in Indonesia and no error in his conclusion that [Mr. Sagala] did not establish a likelihood of his being harmed in the future." Admin. R. at 2. Mr. Sagala then filed a timely petition for review.

## Discussion

Because the BIA issued its decision by a brief order signed by a single board member under 8 C.F.R. § 1003.1(e)(5), we review the BIA's decision as the final order of removal but "may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007). "Our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole. Agency findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 788–89 (quotations, citation, and brackets omitted). We review the agency's legal conclusions de novo. *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005).

### A. Asylum

Mr. Sagala has not challenged the agency's determination that he was not eligible for asylum on account of his late-filed application. He therefore has forfeited consideration of that ruling. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). But even if Mr. Sagala had challenged this ruling in his petition, we would not have jurisdiction to review it. *See* 8 U.S.C. § 1158(a)(3); *Sviridov v. Ashcroft*, 358 F.3d 722, 730-31 (10th Cir. 2004).

**B.     Restriction on Removal**

Restriction on removal prohibits the removal of "an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  "The restriction statute is satisfied by a showing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds upon returning to [his] country of origin."  *Tulengkey*, 425 F.3d at 1280 (quotation omitted).  Whether an alien has demonstrated persecution is a question of fact. *Hayrapetyan v. Mukasey*, 534 F.3d 1330, 1335 (10th Cir. 2008).

Mr. Sagala first takes issue with the IJ's purported failure to make a credibility finding.  While it is true that the IJ did not make a credibility finding during his oral decision, he did make one in his closing remarks to Mr. Sagala: "And it doesn't show in the record, . . . I found that you were basically credible, that what you told me was the truth, as far as you know it, and it's just that what happened to you in the past wasn't sufficiently harmful to qualify you for asylum."  Admin. R. at 136:10-14.  Thus, it is not only clear that the IJ made a credibility finding, but that the finding was favorable to Mr. Sagala.

On a related note, Mr. Sagala argues that comments the IJ made during the hearing regarding the nature of the injuries he sustained during the 1998 demonstration suggest that the IJ was biased against him.  But the exchange

concerning Mr. Sagala's injuries was nothing more than an attempt to resolve a discrepancy between a doctor's report, which stated that he had been burned on his arm and his leg, and Mr. Sagala's testimony that he was burned on his arm but scratched on his leg. Accordingly, we see no evidence of bias in this colloquy.

Next, Mr. Sagala contends that, viewed cumulatively, the treatment he described rises to the level of past persecution, which would give rise to a rebuttable presumption of a well-founded fear of future persecution, *see Hayrapetyan*, 534 F.3d at 1336. We disagree for three reasons.

First, there is scant evidence that the actions related to his academic past were "inflicted by the government or by a non-governmental group that the government is unwilling or unable to control," as is required for a finding of past persecution. *Sidabutar v. Gonzales*, 503 F.3d 1116, 1124 (10th Cir. 2007) (quotation omitted). The fact that his Muslim public-school teacher refused to do anything about the Muslim student Mr. Sagala fought with does not suggest that the Indonesian government was unwilling or unable to control a non-governmental group, as there is no evidence the teacher's inaction was ever made known to school administrators or anyone expressly acting on behalf of, or with the knowledge and approval of, the government. Likewise, Mr. Sagala's vague account of the prohibition against his involvement in the school honor guard at the national level on account of his religion provides no compelling evidence of governmental involvement.

Second, as to the street demonstration in which he participated, Mr. Sagala testified that its purpose was to protest "economic crisis," and that "[t]here's a lot of things that cause[] economic crisis, some of them politics, some of them related to religion." Admin. R. at 89:16-18. He also stated that he was invited to participate in the demonstration as the head of an Indonesian architectural association, and he was joined by university students. While there is no dispute that the use of chemicals to disperse the demonstrators was carried out by the military, Mr. Sagala's testimony undercuts the necessary link between that action and either his religion or his ethnicity. He provided no evidence that the military action was directed at him personally, or at the group as a whole, on account of a protected ground.

Third, even if the record compelled a finding that there was a sufficient nexus between the past events, the requisite governmental involvement, and a protected ground, harm must rise to a certain level in order to qualify as persecution. We have defined that level as "the infliction of suffering or harm upon those who differ (in race, religion, [nationality, membership in a particular social group,] or political opinion) in a way regarded as offensive, and requires more than just restrictions or threats to life and liberty." *Tulengkey*, 425 F.3d at 1280 (quotation omitted). As the IJ found, the acts Mr. Sagala relies on for his claim of past persecution are more like treatment we have considered discriminatory rather than treatment we have viewed as persecution. *Compare*

-8-

*Sidabutar*, 503 F.3d at 1124 (finding of past persecution not compelled where Indonesian Christian was repeatedly beaten by Muslim classmates and robbed by Muslims); *Tulengkey*, 425 F.3d at 1281 (same where Indonesian Chinese-Christian petitioner was robbed, fondled, sustained head injury, and witnessed an armed Muslim mob stealing food and hitting guests at a relative's wedding); *Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir. 2003) (same where Moldavan petitioner of Russian descent and her husband could not obtain state jobs but secured other employment; petitioner's children could attend private colleges but not public ones; petitioner vaguely described threatening phone calls; petitioner received a threatening letter ten years prior; and petitioner's husband received notes containing racial slurs, had his mailbox broken, and found trash left by his door); and *Kapcia v. INS*, 944 F.2d 702, 704-05, 708 (10th Cir. 1991) (same where Polish petitioner was twice detained, beaten, and interrogated for two-day periods; whose parents' home was searched; whose work locker had been repeatedly broken into; and who had been assigned poor work tasks, denied bonuses, and conscripted into army where he was constantly harassed); *with Nazaraghaie v. INS*, 102 F.3d 460, 463-64 (10th Cir. 1996) (suggesting that a severe beating and ten-month imprisonment on account of political opinion was persecution).

Moreover, we find no merit in Mr. Sagala's contention that the IJ diminished the harm he suffered at the demonstration, and thereby called the

integrity of the proceedings into question, by stating that "'having been hit by tear gas during a street demonstration is not past persecution.'" Pet'r's Br. at 16 (quoting Admin. R. at 62). The fact that the IJ did not reference the unfortunate fact that Mr. Sagala sustained a severe burn to his arm is not enough to call the integrity of the proceedings into question, as the injury does not compel a finding of past persecution, even when viewed alongside the other incidents Mr. Sagala described. Accordingly, we conclude that substantial evidence supports the IJ's finding that Mr. Sagala failed to demonstrate past persecution and therefore was not entitled to a presumption of future persecution.

Mr. Sagala's third argument is that he established a likelihood of future persecution and the IJ erred in finding that it would be reasonable for him to relocate to a predominantly Christian location in Indonesia.[1] We need only address the relocation issue because an applicant for restriction on removal "cannot demonstrate that his . . . life or freedom would be threatened" if an IJ "finds that the applicant could avoid . . . future [persecution] . . . by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R.

---

[1] The BIA's broadly-worded affirmance of the IJ's future-persecution finding does not explicitly mention relocation, but the IJ made an express finding regarding the reasonableness of relocation. Accordingly, we consider that the BIA relied on or incorporated the IJ's reasoning regarding relocation, so we may look to the IJ's decision. *See Sarr*, 474 F.3d at 790.

§ 1208.16(b)(2); *see Tulengkey*, 425 F.3d at 1281 (addressing only relocation ground for future-persecution finding).

Mr. Sagala's argument regarding relocation is two-fold. He first contends that the IJ did not identify any specific place in Indonesia for relocation. This contention is squarely undercut when considering the IJ's decision as a whole. In support of his finding that there are places in Indonesia to which Mr. Sagala could relocate, the IJ relied in part on the International Religious Freedom Report for 2005 prepared by the United States Department of State. The report states that in areas where Christians are in the majority, such as parts of Papua, there was no major inter-religious violence but only some grievances between persons of different faiths, the majority of which had to do with economics rather than religion. Admin. R. at 146. The IJ also referenced the testimony of Mr. Sagala's pastor, who gave Papua as an example of a predominantly Christian area where Christians can practice their religion. *Id.* at 58; 128-29. Thus it is apparent that the IJ at least had Papua in mind when he found that it was reasonable for Mr. Sagala to return to a predominantly Christian area of Indonesia.

The second part of Mr. Sagala's relocation argument is that there is no place in Indonesia that is safe for Christians. In support, he points to the 2002 and 2005 bombings in Bali, which he contends is otherwise considered one of the safest island in Indonesia. However, conditions on Bali do not undercut the IJ's reliance on conditions in Papua. Mr. Sagala also points to a statement in the

-11-

Country Report for 2005 that there are numerous human rights abuses throughout Indonesia, but this broad statement does not show that relocation would be unreasonable.[2] Thus, substantial evidence supports the IJ's relocation finding.

## C. Convention Against Torture

To obtain CAT relief, an alien must demonstrate a likelihood of future torture "by a public official, or at the instigation or with the acquiescence of such an official." *Sidabutar*, 503 F.3d at 1125 (quotation omitted). The BIA did not explicitly mention torture or the denial of CAT relief in its decision, stating only that it found "no error in [the IJ's] conclusion that [Mr. Sagala] did not establish a likelihood of his being harmed in the future." Admin. R. at 2. The lack of any reference to CAT relief comes as no surprise, as we have examined the notice of appeal and the brief Mr. Sagala filed with the BIA and see no issue listed or argument presented that concerns the denial of his application for CAT relief.[3] Therefore, we lack jurisdiction to review Mr. Sagala's arguments pertaining to his application for CAT relief. *See Sidabutar*, 503 F.3d at 1119, 1121-22 (explaining

---

[2]     Like the IJ, we have focused on Mr. Sagala's religion rather than his Batak ethnicity because his evidence primarily concerns his religion. He presents only conclusory and unsupported arguments about past and potential harm on account of his ethnicity.

[3]     We found only one passing reference to "torture" in Mr. Sagala's BIA brief, where Mr. Sagala contended that the IJ should have recognized the treatment he received in grammar school and at the demonstration "as persecution and torture under the totality of the circumstances." Admin. R. at 19. We do not view this cursory reference to a past event as an argument concerning the likelihood of torture in the future.

that issue exhaustion is jurisdictional, and to exhaust, an alien must present an issue to the BIA or the BIA must actually decide the issue).

## <u>Conclusion</u>

The petition for review is dismissed in part and denied in part.

Entered for the Court

Michael W. McConnell
Circuit Judge