**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MARCELO HALMENSCHLAGER,

      Petitioner,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

      Respondent.

No. 08-9514
(Petition for Review)

---

**ORDER AMENDING DECISION**

---

Before **O'BRIEN**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

---

This matter is before the court on Respondent Eric H. Holder, Jr's *Motion For Technical Correction of Decision*. In the motion, the government correctly identifies an error in the Order & Judgment filed in this matter on July 31, 2009. Specifically, the decision improperly referred to the BIA's review as a single judge review when, in fact, a three member panel reviewed the appeal from an IJ's decision. Respondent seeks correction of that error, and also seeks deletion and amendment of other language used in the Order & Judgment.

Upon careful consideration, the motion is granted in part and denied in part. We grant that portion of the request seeking correction of the language used to reference the Board's review. We deny that portion of the motion seeking to

amend this court's statement: "We acknowledge a facially apparent disparity between the BIA's view and our view of its appellate role with regard to factual determinations and legal conclusions in persecution cases." We add, however, at the end of the paragraph immediately preceding the quoted language the following: "Compelling as it may be, that dictum cannot resolve the dilemma because it is in tension with our precedents."

An amended decision is attached to, and incorporated in, this order. The clerk is directed to issue the amended Order & Judgment nunc pro tunc to our original July 31, 2009, filing date.

Entered for the Court

ELISABETH A. SHUMAKER
Clerk of Court

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MARCELO HALMENSCHLAGER,

      Petitioner,

v.

ERIC H. HOLDER, JR.,[*]
United States Attorney General,

      Respondent.

No. 08-9514
(Petition for Review)

---

**ORDER AND JUDGMENT**[**]

---

Before **O'BRIEN**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

---

An Immigration Judge (IJ) granted Marcelo Halmenschlager's petition for

asylum, finding him to be a refugee based upon incidents of mistreatment and his

fears of future persecution because of his homosexuality.  The Board of

Immigration Appeals (BIA) accepted the factual findings of the IJ but concluded

---

[*]     Pursuant to Fed. R. App. P. 43(c)(2), Eric H. Holder, Jr. is substituted for Michael B. Mukasey as the respondent in this appeal.

[**]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

"the evidence of record does not establish an objective well-founded fear of persecution." Admin. R. at 2. It vacated the grant of asylum and ordered Halmenschlager removed to Brazil. He petitioned for judicial review of the order of removal. We deny the petition.

## Background

Halmenschlager, a self-described homosexual with effeminate traits, was apprehended in 2004 when he attempted to enter this country illegally. He conceded the charge of removability and sought asylum based on his sexual orientation.

At the hearing before the Immigration Judge (IJ), Halmenschlager was the only witness. He testified at length concerning his experiences in Brazil. By his first year in school, he realized he was different from other boys. Schoolmates called him names, laughed at him, and beat him. Other children, especially boys, would not play with him. He changed schools in the third grade but he was still harassed and beat by other children. He was afraid to tell the teachers because he believed the more people who knew of his problems, the more he would be subjected to mistreatment. Most of his friends in high school were girls. He had a troubled relationship with his stepfather who said Halmenschlager was not the type of son he expected.

Two adverse incidents occurred by the time Halmenschlager was seven years old. At age five or six, teenagers exposed themselves to him and at age

-2-

seven a man exposed himself and fondled him. Adults were of little assistance--his teachers did not help him and his stepfather ignored him.

In a later incident, when he was sixteen, a male neighbor exposed himself to Halmenschlager and a female friend. They reported the incident to a police officer who lived in the neighborhood. The officer brought the neighbor to the police station. The neighbor blamed Halmenschlager for the incident because he was effeminate and the neighbor was never punished.

Self-conscious and fearful, Halmenschlager tried to avoid going out in public. But when he began working at the airport and attending university classes, he needed to commute by public transportation. Every day people called him names and he was worried that someone would follow him. At work he and a homosexual co-worker were isolated from the public because his boss was ashamed of the way he gestured when dealing with people.

Because of depression he quit the airport job, but five months later the airport hired him back. He was required to register for military service, but was excused because he had rheumatic fever as a child. When he went to register soldiers called him names and said they would have some fun with him once he was in the army. A boyfriend broke off their relationship for fear of being identified as a homosexual. Halmenschlager was miserable and pretty much restricted himself to his home to avoid unpleasant interactions. He went to a psychiatrist who treated him for depression and anxiety disorder. He took Prozac.

A friend told him of another homosexual who had been murdered due to his sexual orientation. He no longer wishes to hide his sexual orientation and believes he would not be safe anywhere in Brazil. Halmenschlager left Brazil and entered the United States illegally when he was 26 years old.

For documentary evidence, the record contained State Department reports from 2002 to 2004.  Admin. R., Vol. I at 21.  The reports paint a picture of violence in the country on a number of fronts.  The most recent report, based on 2004 events (2004 report), mentioned police "killings for hire and death squad executions of suspected criminals, persons considered undesirable, indigenous people, and labor activists." *Id.*  "Violence and discrimination against women; child abuse and prostitution; and trafficking in persons, particularly women and children for the purpose of prostitution and slavery, remained problems." *Id.* "Rural violence, including the killings of land reform and rural labor activists persisted." *Id.*  The report contained accounts of discrimination against the elderly.

Specifically concerning homosexuals, the 2004 report said "[t]here was a history of societal violence against homosexuals. Although the Constitution does not prohibit discrimination based on sexual orientation, state and federal laws do prohibit such discrimination, and the federal and state governments remained committed to combating it.  According to the Ministry of Health, there were approximately 180 killings of homosexuals during the year." *Id.* at 42  Brazil,

-4-

which occupies an area slightly smaller than the continental United States (not counting Alaska and Hawaii) had a population of over 180 million in 2004.  No reasons were given for the homosexual murders.  Other instances of violence were reported.  "[Non-governmental organizations] confirmed that police committed abuse and extortion directed against transvestite prostitutes in the cities. . . ." *Id.* at 43.  The report mentioned high profile prosecutions and civil suits brought against government officials, gang members, and others for homosexual related-violence. The report went on to say:

> The Secretariat of State Security in Rio de Janeiro, in partnership with [non-governmental organizations], operated a hotline and offered professional counseling services to victims of anti-homosexual crimes.
>
> In November, Rio de Janeiro state lawmakers reversed the governor's veto on a bill that gives same-sex partner benefits to government employees. The state's 70-member assembly voted 37 to 21 to override the veto and the law went into effect. In July, a Sao Paulo state court ordered 15 health insurance companies to recognize same-sex couples in their coverage.
>
> In April, the Special Secretariat for Human Rights launched the "Brazil Without Homophobia" program, which sought to stop violence against homosexuals, provide legal counsel to victims of violence, and prevent anti-homosexual sentiment by providing tolerance training for school-aged children.  According to the National Secretariat for Human Rights, the program aims to strengthen public institutions and [non-governmental organizations] that promote homosexual rights and combat homophobia; offers training to professionals and representatives in the homosexual community; creates publicity campaigns to raise awareness and disseminate information about homosexual rights and to promote homosexual self-esteem; and encourages reporting of violence against homosexuals.

*Id.* at 42.

In addition to the State Department reports, Halmenschlager submitted accounts compiled by human-rights organizations, newspaper articles, advisories from gay-activist groups, and a report by an anthropology professor. As related to the human rights of homosexuals, these exhibits provided significant anecdotal evidence of discriminatory conditions, violent incidents, and police corruption.

After reviewing the documentary evidence and listening to the testimony, the IJ granted asylum. In his decision, the IJ recounted Halmenschlager's testimony and expressed a belief that he is homosexual and "very feminine." Admin. R., Vol. II at 408. Noting that "in some cases the only available evidence of an alien's subjective fears may [be] the alien's own testimony," the IJ found Halmenschlager gave a "sufficiently detailed, consistent, and believable" report of his experiences in Brazil, thus "provid[ing] a plausible and coherent account of the basis for his fears [without] further corroboration of any further evidence." *Id.* at 407.

From the documentary exhibits, the IJ decided "that even though Brazil is making some progress . . . homosexuals still in that particular country have problems." *Id.* at 412. They "are subject to persecution by other individuals" and "the government hasn't done a lot in the past." *Id.* at 412-13. In the IJ's view, "when you are with a group of people that are like you in large number,

you are okay, but I think once you go [to] your separate city and so forth, that there are problems in Brazil, and the Court has read those articles indicating that Brazil is one of the worst countries in the world for this particular problem." *Id.* at 413.

Although the IJ recounted Halmenschlager's testimony and found it credible, he did not make specific findings on past persecution or the probability of future persecution. One might infer, however, he found the presence of past persecution, a reasonable fear of future persecution, or both.

The Department of Homeland Security appealed to the BIA. In a three-member decision, the BIA disposed of the matter without extensive analysis. Unlike the IJ, it determined that Halmenschlager was not eligible for asylum relief. In reversing the IJ's decision, the BIA first determined Halmenschlager had failed to establish past persecution, in that the most serious incident happened when he was seven years old and "there is no evidence that the event occurred on account of the respondent's sexual orientation (assuming it could have been discerned at that time) or that had the authorities been informed, they would not have punished the perpetrator." Admin. R., Vol. I at 2. The same was true of other incidents occurring in Halmenschlager's childhood. *Id.* And subsequent events, "while abhorrent in many respects, do not rise individually or cumulatively to the level of persecution." *Id.*

-7-

Reviewing the exhibits in the record, the BIA recognized Brazil's "history of problems with violence against homosexuals." *Id.* at 2-3. The latest State Department report, however, indicated to the BIA that Brazil had taken steps to protect the rights of homosexuals. Though "societal discrimination and occasional violence exist, without more, this does not establish an objective basis for a well-founded fear of persecution." *Id.* at 3. The BIA vacated the IJ's grant of asylum and entered a final order of removal. Halmenschlager then filed his petition for review in this court. Our task is to review the decision of the BIA, not that of the IJ. *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007); *Awolesi v. Ashcroft,* 341 F.3d 227, 231 (3d Cir. 2003). Halmenschlager claims the BIA erred in concluding: 1) the level of harm he suffered because of his homosexuality does not rise to the level of persecution; 2 he has not demonstrated a well founded fear of future persecution; and 3) country conditions in Brazil have changed.

## Standard of Review

As a threshold matter, we must determine the standard of review to be applied to Halmenschlager's arguments.[1] In doing so, we recognize the difference

---

[1]    Initially the parties agreed that our review was limited to determining whether substantial evidence supported the BIA's decision. Not satisfied, we ordered supplemental briefing. The parties were instructed to discuss "[w]hether this court should review de novo the BIA's reversal of the IJ's determination to grant Halmenschlager's request for asylum," based on the statement in *Kabba v.*

(continued...)

in the approaches taken by this court and the BIA. This court has long held "'the ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution.'" *Hayrapetyan v. Mukasey,* 534 F.3d 1330, 1335 (10th Cir. 2008) (quoting *Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1091 (10th Cir. 2008)). Although "[s]ome circuits deem this a mixed question calling for de novo review," Tenth Circuit "precedent forecloses any argument that the application of a correct legal definition for persecution to the facts of a specific case is a mixed question of law and fact, to be reviewed under some standard less deferential than substantial evidence." *Vincente-Elias*, 532 F.3d at 1091 & n.5 (quotation and alteration omitted).

The BIA, however, takes a different view. It is an appellate body charged with reviewing agency decisions. 8 C.F.R. § 1003.1(d)(1). The Attorney General has delegated to it the authority "to prescribe procedures governing proceedings

---

[1](...continued)
*Mukasey*, 530 F.3d 1239, 1245 (10th Cir. 2008), that we "'consider de novo whether the BIA, in making its own factual findings, actually reviewed the IJ's decision only for clear error,'" as required by § 1003.1(d)(3)(I). Nov. 24, 2008, Order at 1.

In response Halmenschlager now challenges the BIA's evaluation of the evidence under a de novo standard. But he did not raise that issue before the BIA and we therefore lack jurisdiction to consider it. *See Sidabutar*, 503 F.3d at 1122.

before it." *Id.*, § 1003.1(d)(4).  And it has done so. The BIA does not engage in de novo review of the IJ's factual findings.  It may take administrative notice of commonly known facts but may not otherwise engage in fact finding.  If the facts have not been adequately developed it must remand to the IJ to make a record.  On the other hand, the BIA conducts de novo review of questions of law, discretion, and judgment and all other issues.  8 C.F.R. § 1003.1(d)(3).[2]  In adopting the

---

[2]    (3) Scope of review.

(i) The Board will not engage in de novo review of findings of fact determined by an immigration judge.  Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

(ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

(iii) The Board may review all questions arising in appeals from decisions issued by Service officers de novo.

(iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding appeals.  A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand.  If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to the Service.

(4) Rules of practice. The Board shall have authority, with the approval of the Director, EOIR, to prescribe procedures governing proceedings before it.

regulations governing the BIA the Attorney General made a detailed response to comments about the (then) proposed rule and explained the final version and offered reasons for his approach. *Board of Immigration Appeals: Procedural Reforms to Improve Case Management*, 67 Fed. Reg. 54878 (Aug. 26, 2002).

Under its regulatory scheme, the BIA must accept an IJ's factual findings unless they are clearly erroneous; it may not overturn them "'simply because the [BIA] would have weighed the evidence differently or decided the facts differently had it been the factfinder.'" *Id.* at 54889. The "clearly erroneous" standard "does not apply" to "judgments as to whether the facts established by a particular alien amount to 'past persecution' or a 'well-founded fear of future persecution.'" *Id.* at 54890. That is so because "immigration judges are better positioned to discern credibility and assess the facts with the witnesses before them; the Board is better positioned to review the decisions from the perspective of legal standards and the exercise of discretion." *Id.*

In asylum cases, "[t]he immigration judge's determination of 'what happened' to the individual is a factual determination" reviewed for clear error. *Id.* "The immigration judge's determinations of whether these facts demonstrate harm that rises to the level of 'persecution,' and whether the harm inflicted was 'on account of' a protected ground, are questions that will not be limited by the 'clearly erroneous' standard." *Id.*

-11-

"[A]n agency's interpretation of [its own regulations] is . . . controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quotation omitted). The Executive Office for Immigration Review included the persecution classification in its notice-and-comment rulemaking process and later applied it in a formal adjudication. *See BIA: Procedural Reforms*, 67 Fed. Reg. at 54879; *Matter of A-S-B-,* 24 I. & N. Dec. 493, 497 (BIA 2008) ("The question whether these uncontested facts were sufficient to establish a well-founded fear of persecution, however, was a legal determination that was not subject to the clearly erroneous standard of review."). The BIA's interpretation thus warrants full deference under the principles expressed in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1226-27 (10th Cir. 2007).

In dicta, this court recognized the BIA's rules and procedures classifying the persecution determination as a question of law. *Sidabutar*, 503 F.3d at 1122, n.6 (stating that the BIA suggests that it is "not limited to the IJ's determinations of 'past persecution'" and that it "may reach these decisions de novo under its plenary review of legal decisions"). Compelling as it may be, that dictum cannot resolve the dilemma because it is in tension with our precedents.

We acknowledge a facially apparent disparity between the BIA's view and our view of its appellate role with regard to factual determinations and legal

-12-

conclusions in persecution cases.  Had the differences been brought to the attention of the BIA and thereby properly preserved it would be an issue subject to our review.  Since the issue was not exhausted we lack jurisdiction to consider it. *Sidabutar*, 503 F.3d at 1122.  We now turn to the issues properly before us.

### Discussion

Statutory, regulatory, and judicial law specify the essential components of eligibility for asylum relief.  An applicant must demonstrate that he is a refugee, meaning that "he is outside" the country of his nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).

Although persecution has no statutory definition, "we have held that a finding of persecution requires the infliction of suffering or harm upon those who differ . . . in a way regarded as offensive.'"  *Hayrapetyan*, 534 F.3d at 1337 (quotation omitted).  It "must entail more than just restrictions or threats to life and liberty."  *Id.* (quotation omitted).  Of equal concern is the source of the persecution, if established.  It is not sufficient for an applicant to be persecuted in some undifferentiated way or by disparate individuals or groups.  The persecution must have been inflicted by the government or by a non-governmental individual or group the government is unwilling or unable to control."  *Id.* (quotation omitted); *see also In re Acosta*, 19 I. & N. Dec. 211, 222-23 (BIA 1985) (holding

that persecution encompasses only harm inflicted "either by the government of a country or by persons or an organization that the government was unable or unwilling to control"), *overruled in part on other grounds by INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987).  *Accord Ramos Barrios v. Holder*, ___ F.3d ___, 2009 WL 1813469 (9th Cir. June 26, 2009); *Burbiene v. Holder*, 568 F.3d 251, 255 (1st Cir. 2009); *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009); *Niang v. Gonzales*, 422 F.3d 1187, 1194 (10th Cir. 2005); *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004).

An applicant may establish refugee status with a showing of "past persecution" or a "well-founded fear of future persecution."  8 C.F.R. § 1208.13(b).  "An applicant who has been found to have established . . . past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim."  8 C.F.R. § 1208.13(b)(1).  For a "well-founded fear of persecution, 'it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.'"  *Hayrapetyan*, 534 F.3d at 1335 (quoting *Cardoza-Fonseca*, 480 U.S. at 440).

"'[P]ersecution on account of membership in a particular social group'" is "directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic . . . that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences."  *Niang*, 422 F.3d at

-14-

1199 (quoting *In re Acosta*, 19 I. & N. Dec. at 233).  The agency has "formally adopted the position that homosexuals do constitute a particular social group." *Karouni v. Gonzales*, 399 F.3d 1163, 1171 (9th Cir. 2005) (alteration and quotation omitted).

"Although always deferential to agency fact-finding, we must ensure that BIA conclusions are sufficiently supported by the available evidence."  *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006).  "'Our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole."  *Id.* (alteration and quotation omitted).  "[W]here the BIA determines a petitioner is not eligible for relief, we review the decision to determine whether the record on the whole provides substantial support for that determination."  *Id.*

The record indicates that Halmenschlager relied mostly on childhood events and the cumulative effects of discrimination and harassment by diverse individuals in his adulthood.  The most troubling incidents occurred before Halmenschlager's homosexuality was apparent to others and without any connection to action or inaction by the government or entities or individuals it is unable or unwilling to control.  He testified credibly as to the bleak nature of his life in Brazil and is deserving of sympathy.  But other than childhood "beatings" at the hands of other children, he related no instance of violence directed toward him because of his sexual preference.  Nor is there evidence of credible threats to his safety or well

-15-

being.[3]  Moreover, there is no evidence the unpleasantness he experienced came from the government or individuals or entities it was unable or unwilling to control.  The isolated failure of teachers to respond adequately to childhood bullying (particularly if the problems were not called to their attention) or one police officer's failure to respond appropriately to improper sexual conduct is not necessarily sufficient to show "persecution" even when accompanied by evidence of general intolerance of homosexuals in Brazil, particularly when the State Department reports government policies and efforts to restrain such attitudes.[4]

The BIA denied Halmenschlager's asylum request for failure to demonstrate "persecution" on account of his homosexuality.  The BIA's decision was terse but

---

[3]     The IJ recounted his testimony about the most ominous threats made against him: "He indicated that when he went to register [for military service] that the soldiers were hassling him.  They were calling him names and they said the[y] would have a lot of fun with him once he got into the army."  Admin. R. at 468 Such taunts, unaccompanied by more serious acts, are insufficient to show persecution. *See Witjaksono v. Holder*, No. 08-9540, 2009 WL 2192657, *6 (10th Cir. July 17, 2009)  ("Verbal taunts, while offensive, fall within the bounds of harassment and discrimination, not persecution."). In any event he was excused from military service because he had rheumatic fever as a child.

[4]     Conclusions drawn from State Department country reports as well as reports from non-governmental organizations and other entities and individuals are subject to de novo review by the BIA, and with good reason.  "The most common facts about country conditions appropriate for administrative notice are those contained in country reports and profiles prepared by experienced foreign service officers in the Department of State who are experts on specific regions and countries."  As the courts have recognized, they, the immigration judges, and the Board owe deference to the Department of State on such matters of foreign intelligence as assessments of conditions. *BIA*: *Procedural Reforms,* 67 Fed. Reg. at 54892 (discussing administrative notice of facts).

"contains a discernible substantive discussion" and is therefore sufficient for our principled review. *Uanreroro*, 443 F.3d at 1204. The BIA gave considered, supported reasons for its determination that Halmenschlager's experiences did not add up to past persecution. Under our standard of review, we do not disturb the BIA's finding. *See Sidabutar*, 503 F.3d at 1124 (holding substantial evidence supported absence-of-persecution finding in spite of evidence of repeated beatings, confrontations accompanied by money demands, and burning of a motorcycle).

Without a credible showing of past persecution based on his homosexuality, Halmenschlager was not entitled to a presumption of future persecution. 8 C.F.R. §§ 208.13(b)(1), 1208.13(b)(1). Instead, as an alien "basing [his] asylum claim[] upon a well-founded fear of future persecution," he "must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Yan v. Gonzales*, 438 F.3d 1249, 1251 (10th Cir. 2006) (quotation omitted).

Evidence relating to Halmenschlager's fear of future persecution included State Department reports on the status of human rights in Brazil and publications of nongovernmental organizations. Halmenschlager argues that the BIA erred by relying on only the latest state department country report and failing to credit exhibits describing harm done to homosexuals.

-17-

"A state department report on country conditions may be probative in a well-founded fear case." *Yuk v. Ashcroft,* 355 F.3d 1222, 1236 (10th Cir. 2004) (alteration and quotation omitted). Indeed, these reports are "generally deemed authoritative for purposes of immigration proceedings." *Pulisir v. Mukasey*, 524 F.3d 302, 310 (1st Cir. 2008). "In certain circumstances," the BIA may "give the contents of such reports appreciable--even determinative--weight." *Id.* "[C]onflicting reports, for all their insights, may have drawbacks of their own." *Gonahasa v. U.S. INS*, 181 F.3d 538, 542 (4th Cir. 1999). Private entities have done important work "'in exposing inhumane practices,'" but "'these organizations may have their own agendas and concerns, and their condemnations are virtually omni present.'" *Id.* (quoting *M.A. v. U.S. INS*, 899 F.2d 304, 313 (4th Cir. 1990) (*statutorily superseded on other grounds*).[5]

Unquestionably, Halmenschlager showed that homosexuals may be mistreated in Brazil. But neither his testimony nor the documentary evidence requires a finding that he faces persecution if returned to Brazil. "[I]t is not our

---

[5]    As the agency states, "reports by NGOs are simply not as reliable as those of the Department of State because the mission of those organizations is to advocate specific ideas and views, their positions are often based on anecdotal experiences of identified and unidentified persons, and their opinions tend to lack the discernment and expertise of those provided by the Department of State." *BIA: Procedural Reforms,* 67 Fed. Reg. at 54892 (discussing administrative notice of facts). "The important, complicated, delicate, and manifold problems of assessing conditions in a foreign country warrant deference to those whose expertise the United States tasks with that duty." *Id.*

prerogative to reweigh the evidence, but only to decide if substantial evidence supports the [agency's] decision." *Yuk*, 355 F.3d at 1236. We find that the BIA acted reasonably in choosing to give greater weight to the 2005 assessment of the State Department.

And that report does not compel a finding that Halmenschlager demonstrated a reasonable fear of future persecution. The unvarnished fact that 180 homosexuals were killed in one year is not remarkable in a country of over 180 million, particularly when the report does not identify the killings as murder, contains no mention of the reason for the killings or any description of the perpetrators (by type, not by name). The reader is left to speculate--were they homophobic killings or were they motivated by other factors (jilted lovers, drug dealing, prostitution, etc.) and only coincidently involved homosexuals.

The record does not demonstrate that the BIA wrongly rejected Halmenschlager's claim. It is fair to infer, even from its cryptic remarks, that the BIA put the killings of homosexuals in context, considering the diverse area and population of Brazil; the ambiguity surrounding the killings; and the lingering problems affecting the human rights of many citizens, not just homosexuals.

Further, the report describes governmental efforts to combat violence, curb homophobia, and promote nondiscrimination.

The petition for review is DENIED.

Entered for the Court

Terrence L. O'Brien
Circuit Judge

-20-